**Gerald A. HUFFMAN; Gunilla Lukse, Plaintiffs–Appellees, Cross–Appellants,**

v.

**COUNTY OF LOS ANGELES; Sherman Block, Defendants–Appellants, Cross–Appellees.**

Nos. 97–55176, 97–55230, 97–55341.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1998.

Decided June 23, 1998.

Barry M. Wolf, Martin Stein, Timothy T. Coates, Greines, Martin, Stein & Richland, Beverly Hills, California, for defendants-appellants County of Los Angeles and Sherman Block.

Carol A. Watson, Manes & Watson, Los Angeles, California, for plaintiffs-appellees Gerald A. Huffman and Gunilla Lukse.

Before: FARRIS, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the County of Los Angeles may be held liable under the Fourteenth Amendment for failing to warn its off-duty sheriff's deputies against carrying firearms while intoxicated.

I

John Huffman was shot and killed on August 14, 1994, during a barroom brawl with Thomas Kirsch, an off-duty deputy employed by the Los Angeles County Sheriff's Department. On the day of the incident, Kirsch arrived alone at Whitney's Steakhouse ("Whitney's"), a restaurant and bar, between 6:00 p.m. and 7:00 p.m. Kirsch, who was neither in uniform nor on duty, had started drinking earlier in the day. When he arrived at Whitney's, he was carrying his personal, off-duty revolver in the waistband of his pants. The gun was loaded with department-issued ammunition. Kirsch was also carrying his official identification. While at Whitney's, Kirsch consumed four or five "screwdrivers in a bucket," drinks containing vodka and orange juice.

At approximately 8:00 p.m., John Huffman and his girlfriend Deena Hughes also arrived at Whitney's. In a little over an hour, they drank two or three beers each and shared a "kamikaze," a mixed hard-liquor drink. After sitting near Kirsch, Huffman and Hughes, who did not know Kirsch before that evening, began to engage him in conversation. Kirsch did not tell Huffman that he was a sheriff's deputy; instead, he stated that he owned an air conditioning company.

Huffman and Kirsch did not talk continuously because Huffman was "up and around." Huffman "kept going down to" Kirsch, would get "right in his face," and then would come away "bouncing and verbal and vulgar." Although the conversation was "not angry," and Kirsch did not appear "upset," he was "a little resentful" of some of Huffman's questions, which he considered "a little private." At one point, Hughes "nudged Kirsch's elbow and said be careful, because he's an Olympic wrestler." Hughes made this comment in case "[Huffman] was getting on [Kirsch's] nerves or bothering him."

As the conversation progressed, a witness testified, "there was a little aggression going on between [Kirsch and Huffman.]" Huffman eventually offered Kirsch $40.00 to "go out and settle this." Kirsch responded by telling Huffman to "put your money down." The witness stated that Kirsch was "fed up" with Huffman, and that "Kirsch was saying more or less I'm not going to back down, put your money down, let's see it." This exchange occurred more than once. At some point, Kirsch said, "I'm going to go for it," or some similar remark.

Kirsch and Huffman were still talking when Hughes left the dance floor bar and went to the parking lot of Whitney's to bring Huffman's truck around to the front of the restaurant. Huffman then left the bar, and Kirsch followed by a separate route. After Kirsch walked out the door, he was taken to the ground by Huffman, who had wrestled in high school and college, and had coached college wrestling. Kirsch never gave Huffman any commands, nor did Kirsch identify himself as a police officer.

Kirsch later told investigators that while he was struggling on the ground with Huffman, he was thinking: "[T]he fight's on, get the gun out," but "clarified ... that it was not my intention to pull a weapon and shoot Mr. Huffman." Kirsch subsequently testified: "I did not draw the weapon out. The weapon was coming out. I got a hold of the weapon. It was not a draw and shoot." Nevertheless, Kirsch's finger "went to the trigger." Kirsch fired the gun, which was pressed against Huffman's chest, killing Huffman.

Kirsch was taken to a police station and tested twice on an alcohol breathalyzer at approximately 11:30 p.m. Each test registered .209%. The Huffmans' toxicology expert, Darrell Clardy, opined that Kirsch's blood alcohol was around .25% at the time he shot Huffman—approximately 9:00 p.m. Clardy concluded that Kirsch "was significantly intoxicated by alcohol," and "was drunk in the mental aspects." Huffman's blood-alcohol level was .18% at the time of

his death. Huffman's autopsy revealed that Huffman had used between "a third of a line and a line" of cocaine within four hours of the shooting.

Huffman's parents, Gerald Huffman and Gunilla Lukse ("the Huffmans"), brought a section 1983 action against the County of Los Angeles, Sheriff Sherman Block (in his individual and official capacities),[1] and Deputy Kirsch (in his individual and official capacities),[2] claiming that the County had violated the Huffmans' substantive due process rights, as guaranteed by the Fourteenth Amendment. At trial, the Huffmans introduced evidence concerning the Los Angeles County Sheriff's Department's policies on carrying guns off duty and while intoxicated. The Huffmans' expert witness, James Fyfe, testified that the sheriff's department had devoted insufficient attention to the unlawful use of firearms by off-duty deputies, including deputies' use of firearms while intoxicated. Fyfe relied on department reports indicating that sixty-three off-duty shootings and seventeen off-duty brandishings occurred from 1989 to 1994. Fifteen of these shootings or brandishings involved the use of alcohol. Although Fyfe acknowledged that these incidents had all been investigated by the department, he deemed the investigations deficient, particularly with respect to allegations of alcohol use. After the close of the Huffmans' case and again after the close of the County's case, the County moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, but the motions were denied.

The jury returned a special verdict in favor of the Huffmans, and awarded them $750,000 in damages. The County thereupon filed a renewed motion for judgment as a matter of law under Rule 50, which was again denied. The district court entered judgment in favor of the Huffmans, awarding them $450,000 after subtracting the $300,000 settlement with Kirsch. The County then filed a motion for a new trial and again renewed its Rule 50 motion. Both motions were denied. This appeal followed.

## II

Judgment as a matter of law is appropriate when the evidence, "viewed in the light most favorable to the nonmoving party," could not reasonably support the verdict. *Amarel v. Connell,* 102 F.3d 1494, 1517–18 (9th Cir. 1997). We review the district court's denial of the County's motion for judgment as a matter of law de novo. *See Pierce v. Multnomah County,* 76 F.3d 1032, 1037 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996).

Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." 42 U.S.C. § 1983. The Huffmans contend that the County deprived them and their son of rights guaranteed by the Due Process Clause of the Fourteenth Amendment. That clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV. The Due Process Clause has been interpreted to protect substantive as well as procedural rights. *See Washington v. Glucksberg,* —— U.S. ——, ——, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) (collecting cases). The Huffmans contend that the County violated their son's right to life, as well as their right to a relationship with their son. Our decisions have recognized the existence of both of these substantive due process rights. *See Smith v. City of Fontana,* 818 F.2d 1411, 1417–18 (9th Cir.1987).

To be held liable under section 1983, a person must act "under color of" law. 42 U.S.C. § 1983. The trial judge determined "as a matter of law that [Kirsch] was not acting under color of law when Mr. Huffman was shot and killed." The judge later in-

---

1. Hereinafter, defendants County of Los Angeles and Sheriff Block will be referred to collectively as "the County."

2. Prior to trial, Kirsch settled with the Huffmans for $300,000, and was dismissed with prejudice as a defendant.

structed the jury that Kirsch was acting neither under color of law nor within the scope of his employment at the time of the incident.

▇▇▇ The Supreme Court has interpreted the phrase "under 'color' of law" to mean "under 'pretense' of law." *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). A police officer's actions are under pretense of law only if they are "in some way 'related to the performance of his official duties.'" *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 838 (9th Cir.1996) (quoting *Martinez v. Colon,* 54 F.3d 980, 986 (1st Cir.1995)). By contrast, an officer who is "'pursuing his own goals and [i]s not in any way subject to control by [his public employer],'" *id.* (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1151 (3d Cir.1995)), does not act under color of law, unless he "purport[s] or pretend[s]" to do so, *id.* Officers who engage in confrontations for personal reasons unrelated to law enforcement, and do not "purport[ ] or pretend[ ]" to be officers, do not act under color of law. *Id.; see also Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 449–51 (1st Cir.1997); *Barna v. City of Perth Amboy,* 42 F.3d 809, 815–18 (3d Cir.1994); *Pitchell v. Callan,* 13 F.3d 545, 547–48 (2d Cir.1994).

▇▇▇ Kirsch was neither on duty nor wearing his uniform on the evening he shot Huffman. Although the weapon Kirsch was carrying was loaded with ammunition issued by the sheriff's department, the weapon itself was Kirsch's own. Moreover, despite a written department policy requiring off-duty officers to "identify themselves as police officers before taking any action, safety permitted," Kirsch never identified himself as a sheriff's deputy on the evening of the shooting. Finally, Kirsch never issued any commands to Huffman. Viewed in their totality, these facts compel the conclusion that Kirsch's actions were not "in some way 'related to the performance of his official duties.'" *Van Ort,* 92 F.3d at 838 (quoting *Martinez v. Colon,* 54 F.3d at 986). Accordingly, the district court did not err in ruling that Kirsch's actions did not occur under color of law, and therefore could not give rise to liability on the part of the County under *conventional* section 1983 analysis.

## III

Notwithstanding its conclusion that Kirsch did not act under color of law when he shot Huffman, the district court ruled that the County could be held liable for Kirsch's actions. The contours of section 1983 liability for harms inflicted by persons not acting under color of law are shaped by the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* Joshua DeShaney and his mother contended that the Winnebago County Social Services Department deprived Joshua of liberty without due process of law in violation of the Fourteenth Amendment by failing to protect him from violence at the hands of his father. *See id.* at 191, 109 S.Ct. 998. The Supreme Court held that the state was not constitutionally obligated to protect Joshua:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

> . . . .

> As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id.* at 195–97, 109 S.Ct. 998.

▇▇▇ There are two exceptions to the general rule that "a State's failure to protect an individual against private violence ... does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998. First, "'when the State takes a person into its custody and holds him there against his will, the Constitution imposes some responsibility

for [that person's] safety and general well-being.'" *See Wang v. Reno,* 81 F.3d 808, 818 (9th Cir.1996) (quoting (*DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998)). It is undisputed that Huffman was not in custody when the shooting occurred.

The second exception to the *DeShaney* rule against holding state officials liable for private violence exists where the state affirmatively places the plaintiff in a dangerous situation. *See L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992) ("*Grubbs I*"); *Wood v. Ostrander,* 879 F.2d 583, 589–90 (9th Cir. 1989). This exception is based upon the following excerpt from *DeShaney:*

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.* That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all....

*Id.* at 201, 109 S.Ct. 998 (emphasis added).

The danger-creation exception to *DeShaney* was first recognized by this court in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989). In *Wood,* a woman who was raped after the car in which she was a passenger was impounded by a police officer brought a section 1983 suit against the officer. *See id.* at 586. We held that because the officer "'affirmatively placed the plaintiff in a position of danger,'" the officer could be held liable under section 1983. *Id.* at 589–90 (quoting *Ketchum v. County of Alameda,* 811 F.2d 1243, 1247 (9th Cir.1987)).

We again applied the danger-creation exception in *Grubbs I.* In *Grubbs I,* a registered nurse employed by the state of Oregon at a medium-security custodial institution brought suit against state prison officials after she was assaulted by an inmate. *See id.* at 120. We held that the prison officials could be held liable under section 1983 because they "created the danger to which [the plaintiff] fell victim" by selecting a violent sex offender to work alone with her. *Id.* at 121. We explained that the "'danger cre-

ation' basis for a claim ... necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Id.*

On appeal from our remand of *Grubbs I* to the district court, we addressed the level of culpability upon which a state official can be held liable under the danger-creation theory. *See L.W. v. Grubbs,* 92 F.3d 894 (9th Cir. 1996) ("*Grubbs II*"). We held that, to prevail under this theory, it is not sufficient for the plaintiff to demonstrate that the state official was grossly negligent. *See id.* at 899–900. Instead, we held, "the plaintiff must show that the state official participated in creating a dangerous situation, and acted with *deliberate indifference to the known or obvious danger* in subjecting the plaintiff to it." *Id.* (emphasis added).

Finally, in *Van Ort v. Estate of Stanewich,* 92 F.3d 831 (9th Cir.1996), we examined whether the victims of an assault and attempted robbery by an off-duty San Diego County deputy not acting under color of law could sue the County under section 1983. Among the issues we addressed in *Van Ort* was the causal relationship that a danger-creation plaintiff must establish between the state official's action and the deprivation of the plaintiff's constitutional rights. *See id.* at 836–37. We held that "[p]ointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection.... Rather, the policy must be the proximate cause of the section 1983 injury." *Id.* at 837. We then examined whether the deputy's "private acts" constituted "intervening causes which preclude ... County liability." *Id.* We concluded, "as a matter of law," that because the deputy's intervening "private acts" were "unforeseeable," they broke the chain of proximate cause connecting action under color of law to the alleged violation of constitutional rights. *Id.* Accordingly, we affirmed the district court's judgment as a matter of law in favor of the County. *See id.* at 842.

■ The Huffmans contend that they have established that the County is liable under the danger-creation theory by demonstrating: (1) that the sheriff's department had a policy of requiring deputies, including Kirsch,

to carry guns at all times while off duty; and (2) that the department failed to warn its deputies about the dangers of carrying firearms while intoxicated. The Huffmans further maintain that the department knew of eighty incidents from 1989 to 1994 in which off-duty deputies discharged or brandished firearms. Of these incidents, fifteen involved the use of alcohol.[3] According to the Huffmans, the department failed to take adequate steps in investigating these incidents or in disciplining the officers involved. While conceding that the department has a policy against being "drunk and disorderly" in public, the Huffmans contend that this policy is not "tied in any way to whether or not you carry a gun off duty."

Viewing this evidence in the light most favorable to the Huffmans, we hold, following *Van Ort*, that the "facts do not show, as a matter of law" that the County could have foreseen Kirsch's "private acts" when it allegedly required him to carry a gun off duty. *Van Ort*, 92 F.3d at 837; *see also Springer v. Seaman*, 821 F.2d 871, 876–77 (1st Cir.1987) (although "the question of proximate causation [in a section 1983 action] is sometimes for the court and the sometimes for the jury," the court decides whether reasonable disagreement on the issue is tenable). According to the Huffmans, these "private acts" were as follows: (1) Before the incident, Kirsch consumed four or five hard-liquor drinks, elevating his blood-alcohol level to approximately .25%; (2) Kirsch exchanged unpleasant words with Huffman in the bar, after which Huffman exited the bar with the intention of going home; (3) Kirsch followed Huffman out of the bar by a separate route, even though Kirsch knew that he had a gun tucked in his belt and that Huffman was unarmed; and (4) Kirsch shot Huffman in the chest as the men wrestled outside the bar. Even assuming arguendo that the County did require Kirsch to carry a gun off-duty, as the Huffmans contend, the County could not "reasonably have foreseen" Kirsch's lethal "private acts." *Van Ort*, 92 F.3d at 837.

Our conclusion is supported by the existence of a sheriff's department policy prohibiting deputies from behaving in a "drunk and disorderly" manner in public. The Huffmans offer two reasons why this policy should fail to shield the County from liability. First, the Huffmans maintain, the department's policy fails to protect the public from deputies who, like Kirsch, are "drunk" but not "disorderly." We cannot agree with the Huffmans' contention that Kirsch was not acting "disorderly" on the night of the shooting. According to the Huffmans' own version of events, Kirsch consumed at least four hard-liquor drinks, followed an unarmed man who had once challenged him but who had decided to go home without fighting, and shot that man in the chest. In light of these alleged facts, the Huffmans' contention that Deputy Kirsch's actions were not "disorderly," and therefore in violation of the department's policy, is difficult to fathom.

The Huffmans also contend that the department's policy against "drunk and disorderly" behavior was insufficient to shield the county from liability because it was not "tied in any way to whether or not you carry a gun off duty." The gist of the Huffmans' argument seems to be that, in addition to its policy against being drunk and disorderly, the department should have had a rule against being drunk and disorderly while carrying a gun. However, simple logic compels the conclusion that a general rule barring drunk and disorderly behavior also prohibits such behavior while one is carrying a firearm.

■ The Huffmans maintain that specifically warning deputies concerning the dangers of mixing alcohol and firearms would be more effective than the existing general admonition against drunk and disorderly behavior with respect to deterring shootings by intoxicated officers. However, even if the Huffmans could conclusively demonstrate that such warnings would reduce the frequency of these incidents, and thereby help to protect the public, they would not have established that the County's existing policies violate the Constitution. *See DeShaney*, 489 U.S. at 195, 109 S.Ct. 998 ("[The Due Process

---

3. There are 7,500 deputies in the Los Angeles County Sheriff's Department. Thus, from 1989 to 1994, there was one alcohol-related shooting or brandishing per 3,000 deputies per year.

Clause] forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the state to ensure that those interests do not come to harm through other means.")  The danger-creation exception to *DeShaney* does not create a broad rule that makes state officials liable under the Fourteenth Amendment whenever they increase the risk of some harm to members of the public.  Rather, the danger-creation plaintiff must demonstrate, at the very least, that the state acted affirmatively, *see Wood,* 879 F.2d at 589–90, and with deliberate indifference, *see Grubbs II,* 92 F.3d at 900, in creating a foreseeable danger to the plaintiff, *see Van Ort,* 92 F.3d at 836–37, leading to the deprivation of the plaintiff's constitutional rights, *see id.* at 836.[4]  Whether or not the County's failure specifically to prohibit deputies from carrying guns while drinking was bad policy, it did not violate John Huffman's rights under the Fourteenth Amendment, because the County could not have foreseen Kirsch's actions.

## IV

Because Kirsch's private acts were not foreseeable by the County, and did not occur under color of law, we hold that the district court erred in denying the County's motions for judgment as a matter of law.  Accordingly, we reverse the judgment of the district court and remand with instructions to dismiss.[5]

REVERSED AND REMANDED.

4.  Our sister circuits disagree as to whether the danger-creation exception applies only when the danger created by a state official is directed toward a particular plaintiff, as opposed to being directed toward the general public.  *Compare Reed v. Gardner,* 986 F.2d 1122 (7th Cir.1993) ("When the police create a specific danger, they need not know who in particular will be hurt.  Some dangers are so evident, while their victims are so random, that state actors can be held accountable by *any injured party.*") (emphasis added), *with Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 (3d Cir.1995) ("When the alleged unlawful act is a policy directed at the public at large ... the rationale for the [danger creation] rule disappears.").  Because the Huffmans' claim would fail regardless of whether the danger-creation theory extended to threats to the general public, we leave resolution of this question for another day.

5.  Because the Huffmans are not "prevailing part[ies]," they are not entitled to attorneys' fees under 42 U.S.C. § 1988(b).