HARRY A., Laurie Wilson, Joani Manning, Rob and Stephanie Dean, Larry J. Heiple, Dan E. Sullivan, Catherine A. Slingsby, Susan Susan Trulock, Janeice M. Dahlseid, Fred and Sandy McDonald, Jane Doe I, Linda Carlson, Jane Doe II, Tami S., Audrey O'Neill, Michelle Cole, and Mary Fields, as parents of minor children, Plaintiffs,

v.

Rick DUNCAN, Donald McDermid, and Pat Bannon, the Estate of Ron Fuhrman, Joseph Brott, and Powell County School District, Defendants.

Powell County School District, Joseph Brott and Ron Fuhrman, Third Party Plaintiffs,

v.

Benjamin Frankforter, Matthew Thomas and Eddy Newman, Third Party Defendants.

No. CV 03–13–H–DWM.

United States District Court, D. Montana, Helena Division.

Jan. 13, 2005.

See also 330 F.Supp.2d 1133.

("PCHS") officials Rick Duncan, Donald McDermid, Pat Bannon, Ron Fuhrman (through his estate) and Joseph Brott for injuries that stem from the locker room videotaping scheme carried out by male PCHS students from October 2000 until November 2002. The case is based on claims under 42 U.S.C. § 1983 [1] for civil rights violations, as well as pendent claims for damages under Montana state law. Plaintiffs allege that the school Defendants, through their acts and omissions including failure to adequately supervise the boys, caused the female students to be viewed and videotaped in various states of dress.

Mark E. Jones Missoula, MT, Michele L. Earl–Hubbard, Miles Yanick, Alison P. Howard, Seattle, WA, Wright Noel Bellevue, WA, Alan F. Blakley, Grand Rapids, MI, for Plaintiffs.

Lawrence F. Daly, Candace C. Fetscher, Kathleen L. DeSoto, Missoula, MT, for Defendants.

ORDER

MALLOY, Chief Judge.

## I. Introduction

These high school girls and their parents bring this case seeking money damages against the Powell County School District and Powell County High School

The Defendants have filed three motions for summary judgment and a motion to dismiss. The motions seek (1) dismissal of the individual Defendants on the basis of Montana's immunity statutes; (2) summary judgment on the parents' derivative § 1983 claims based on the alleged violation of their daughters' constitutional rights; and (3) summary judgment based on the Plaintiffs' failure to present any evidence showing conduct on the part of the Defendants sufficient to establish liability under § 1983. There is a separate motion to dismiss but it is treated as a motion for summary judgment and is considered along with the other motions for summary judgment on the Plaintiffs' § 1983 claims.

In my view, the motion on the derivative parental claim is well taken as is the motion on the § 1983 claims. The state claims will be dismissed without prejudice. My reasoning is set forth below.

## II. Factual Background

Three boys at Powell County High School concocted a scheme to film girls in

---

1. Section 1983 provides that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. ...

42 U.S.C. § 1983.

the locker room at the high school. Eddie Newman and Ben Frankforter, PCHS towel boys, and Matt Thomas, who was not employed as a towel boy, videotaped or viewed girls in the PCHS locker room from October 2000 until November 2002. The boys carried out the plan during and after school hours. The videotaping took place while they did their duties as towel boys/student aides but, more often, while they were not acting as towel boys. The boys' primary means of access to the school was to enter during school hours, between 6:30 in the morning and 6:30 at night. They would occasionally work on the scheme in the morning before school, but did the bulk of the work when the school had emptied or when only custodians remained. The boys sometimes went into the school after school hours, but when they did, they did not use keys to do so. If they went in after hours, they would walk around the building and check for an open door. Though some external and internal locks failed, on several occasions the boys could not get in the school after hours. Once they did get in the school after hours by taking the screen off of the weight room window and crawling inside.

The boys viewed and videotaped girls in the locker room during PCHS home games and during regular physical education classes. They also viewed and videotaped girls during two three-day tournaments two of the boys served as towel boys. Frankforter admitted to taping girls in the locker room before and after girls' physical education classes during his free time at school, including times when he was serving as a teacher's aide. During the course of the plan, the boys videotaped from five to seven different locations. They installed one camera behind a two-way mirror in the girls' bathroom. The mirror was fixed

at a slightly abnormal height. Another camera was situated behind a two-way mirror in the back of an old off-color gym locker placed horizontally on top of regular lockers in the boys' locker room. The boys locker room was sometimes used by visiting girls teams. Taping through the two-way mirrors was facilitated by climbing into the ceiling in the boys' locker room and lowering one of the boys into a small space between the walls of the boys' and girls' locker rooms.

To power the cameras the boys ran an extension cord from an outlet in the boys' locker room into the ceiling and down into the space between the walls. An additional cord ran along the top of the lockers in the boys locker room at some point during the scheme. One power outlet for the cords was in the training room at the school. The training room was frequently open when the boys wanted access, but there was at least one occasion when they borrowed a coach's key ring and used it to open the training room.

Sometime in the spring of 2001, Pat Bannon, a PCHS employee and the high school yearbook advisor, proofread the PCHS yearbook. In the yearbook, PCHS student Eric Woodward declared that his idea of a "Perfect 10" is the locker room video. Another student, Josh Garrison pronounced the worst thing about PCHS is the cameras in the bathroom. The advisor took no action based on the sophomoric quotes in the yearbook. No other school official saw or reviewed the yearbook before it was distributed in the fall of 2002.

During the 2001–02 school year, PCHS students viewed tapes of female students in the girls' locker room during school hours in the hallway, in the boys' locker room, and on the gymnasium bleachers following a weight training class. Students discussed the tapes among themselves in classrooms in which teachers were present, though the teachers were

not involved in the conversations. One student, Austin Micu, said that he told teacher Arlita Fenner of the existence of the tape in November 2001. Fenner apparently did nothing following Micu's disclosure. Sometime later, during the winter of 2001–2002, Fenner overheard several female PCHS students discussing the possibility that they were being videotaped when they were in the locker room. She confronted them and was told that the girls had heard gossip about a locker room tape. Fenner then investigated the rumor and explored the girls' locker room and found nothing out of the ordinary. She later told Superintendent Joe Brott that "the girls think they're being videotaped." Brott responded that he would "take care of it," but he took no further action. Brott apparently did not seek, and Fenner did not volunteer, any further information or proof, including the location in which the girls suspected they were being videotaped.

The scheme was eventually uncovered in November 2002 when PCHS janitor Mark Cease investigated the power cord hanging from the ceiling in the girls' locker room. Cease stated that he "should have" noticed the cord earlier. These are the facts, construed most favorably for the plaintiffs.

### III. Analysis

#### A. Summary Judgment Standards

A party moving for summary judgment must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party. *Id.* at 252, 106 S.Ct. 2505.

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court.

If a fact is found to be material, summary judgment will not lie if the dispute about that fact is genuine. In other words, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–252, 106 S.Ct. 2505. The *Anderson* Court instructs that at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. 477 U.S. at 249–50, 106 S.Ct. 2505. However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.*

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Id.* at 252, 106 S.Ct. 2505.

#### B. Defendants' Motion for Summary Judgment on Parents' Derivative § 1983 Claims

Defendants move for summary judgment in their favor on the parent Plain-

tiffs' individual claims under 42 U.S.C. § 1983, arguing that the parents may not bring derivative § 1983 claims on their own behalf based on violations of the constitutional rights of their children. In support, Defendants cite *Morgan v. City of New York*, 166 F.Supp.2d 817, 819 (S.D.N.Y.2001), and *Burrow v. Postville Community School District*, 929 F.Supp. 1193 (N.D.Iowa 1996), both district court cases in which parents were found not to have standing to assert their own individual § 1983 claims based on an alleged constitutional injury to their children. The parents respond by (1) alleging that the Defendants' motion is technically defective under Local Rule 56.1 in that it is not accompanied by a statement of uncontroverted facts and should be denied on that basis, and (2) claiming that the parents' individual claims are not derived from the constitutional injury to their children, but rather are based on an injury to the parents' constitutionally protected interest in the companionship and society of their children.

### 1. Local Rule 56.1

■ The parents argue that the Defendants' motion for summary judgment on the derivative § 1983 claims must be denied because it was not accompanied by a statement of uncontroverted facts as required by Local Rule 56.1(a). That Rule requires the statement of uncontroverted facts to "set forth in serial fashion and not in narrative form" the specific facts on which the movant relies in support of its motion. The Rule further requires that reference be made to that portion of the record which supports each specific fact.

In lieu of a statement of uncontroverted facts, the Defendants submitted excerpts of the deposition testimony of each of the parents in which the parents state that they are asserting individual § 1983 claims based on the viewing of their daughters. Defendants explain that they did not in-

clude a statement of uncontroverted facts because the questions raised by their motion are of a purely legal nature. The Defendants correctly characterize the issues. They do not dispute any of the factual allegations set forth by the parents as bases for their individual claims. In light of the acceptance of these facts, it would be improvident to decide the motion based on an alleged technical failure to comply with the Local Rules. Moreover, issues of standing must be raised *sua sponte*, if necessary. *See San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 778 (9th Cir.1997).

### 2. The Parents' Assertion of a Constitutionally Protected Interest in the Companionship and Society of their Children is not Actionable under § 1983 in this case

The parents concede they do not have standing to bring derivative § 1983 claims based on the viewing of their children. Instead, they argue that their individual claims are based on the violation of a constitutionally protected liberty interest each of them has in the companionship and society of their children. They argue that while the circuits are split with regard to whether there exists a constitutionally protected parental liberty interest in the parent-child relationship, *see Baynard v. Lawson*, 76 F.Supp.2d 688, 692–93, the Ninth Circuit has recognized such an interest in *Kelson v. the City of Springfield*, 767 F.2d 651 (9th Cir.1985). In *Kelson*, the Ninth Circuit allowed plaintiff parents to proceed with their own § 1983 claim against school officials for causing their student son's death. *Id.* at 653–54. The Court wrote, "[T]he parent-child relationship is constitutionally protected and governmental interference with it gives rise to a section 1983 action for damages." *Id.* at 654.

The governmental interference alleged by the Plaintiffs here consists of the problems endured in the familial relations of the Plaintiff families after their daughters were viewed in the taping scheme. In this case, parents describe their alleged constitutional injury as follows:

[T]he parent-plaintiffs had close relationships with their daughters prior to their victimization. The videotaping and viewing of their children has caused tremendous stress on these families and their relationships as well as on the individual family members. [Parent Plaintiffs] have experienced anger, grief, and physical manifestations of stress. [Parent Plaintiffs'] inability to protect their daughters, combined with the anger, grief and stress has caused lack of communication between the parents and children and weakened the closeness of the parent child relationship, permanently altering it.

Pl.'s Response Brief at 3. Because the Ninth Circuit has recognized a parent's individual claim under § 1983 for governmental interference with the parent-child relationship, the parents argue that they have alleged claims sufficient to defeat the Defendant's motion for summary judgment.

The Defendants on the other hand argue that the parents did not plead claims based on violation of their liberty interest in the parent-child relationship in their Amended Complaint, and therefore may not raise such claims now. The Amended Complaint does not explicitly state a claim for interference with the parent-child relationship. In Paragraph 4.2 of the Amended Complaint, the Plaintiffs identify two subclasses, described as "those minors who were videotaped in varying stages of undress" and "those minors who were viewed but not videotaped in some state of undress." Under the heading "Civil Rights Violations," the Plaintiffs allege in Paragraph 5.3 that "the surreptitious viewing

and videotaping of minor children of named Plaintiffs and class members violated their rights to be secure in their persons and their rights of privacy as guaranteed by the United States Constitution." Further on, the Plaintiffs allege in Paragraph 5.6 that "the Defendants demonstrated deliberate indifference to the constitutional rights of Named Plaintiffs, class members, and their minor children by failing to take action even though they had been placed on notice prior to the beginning of the 2002–2003 school year." The Amended Complaint does not contain any reference to the liberty interest recognized in *Kelson*, nor does it assert any other injury to the parents' individual constitutional rights.

▇ The parents may not assert a new theory of recovery in their response to the Defendants' summary judgment motion. To do so deprives the Defendants of the right and opportunity to conduct discovery on the claim or to make pretrial motions regarding the theory of liability. It is likely the Defendants would have done so, given the opportunity, as they argue in their Reply Brief that the type of interference alleged by parents fails to reach the level of interference required for a constitutional claim under *Kelson*. The Defendants did not file a motion for summary judgment on the issue, however, because they were unaware of the existence of the claim. The inability to move for summary judgment on the claim is significant, because case law suggests that the injuries now alleged by parents, if taken as true, are not the type of injuries to the parent-child relationship that are due constitutional protection.

▇ In *Kelson*, the parents were found to have a claim for interference with the parent-child relationship where they alleged that a school's negligence resulted in their son's death. 767 F.2d at 654. The

Court relied heavily on the earlier Ninth Circuit decision in *Morrison v. Jones*, 607 F.2d 1269 (9th Cir.1979), where the Court recognized a liberty interest in the parent-child relationship in the context of a deportation proceeding. There, county officials deported the plaintiff's mentally ill son, a German alien and ward of the state, pursuant to the officials' belief that the plaintiff was incapable of providing the care her son needed. The plaintiff sued under § 1983, alleging deprivation of parental rights without due process of law. The Ninth Circuit reversed the district court's finding of summary judgment for the county, holding that "the integrity of the family unit" is constitutionally protected under the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. 607 F.2d at 1275–76.

The *Kelson* Court noted several other cases in which courts recognized the constitutional right to be free from governmental interference in the parent-child relationship, including *Little v. Streater*, 452 U.S. 1, 17, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981), in which the Supreme Court held that a defendant in a state-initiated paternity proceeding had a Fourteenth Amendment due process right to receive blood grouping tests; *Lassiter v. Dept. of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), in which the Supreme Court held that parents are entitled to due process prior to state termination of parental status on the grounds of unfitness; and *Santosky v. Kramer*, 455 U.S. 745, 752–57, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), in which the Supreme Court similarly held that biological parents have a constitutionally protected liberty interest in the care, custody and management of their child which requires them to be afforded due process at a parental rights termination proceeding initiated by the state. The Court in *Kelson* cited cases from the Seventh and Eighth Circuits find-

ing, as the *Kelson* Court found, that parents may bring a claim for violation of their constitutionally protected interest in the parent-child relationship when state actors cause the death of a child. 767 F.2d at 654–55.

*Kelson* and the cases it cites establishes the existence of a constitutionally protected right to be free from termination of the parent-child relationship or from governmental interference with the parent-child relationship so intrusive as to be the equivalent of termination of that relationship. Each of the cases cited deals either with the death of a child, the loss or imposition of parental rights and responsibilities, or the termination of daily contact with one's children. The parents in this case allege no such injury. Rather, they allege that the viewing and videotaping of their daughters, allegedly caused by the state actors' deliberate indifference has resulted in "tremendous stress on these families and their relationships" and has "weakened the closeness of the parent-child relationship."

But *Kelson* and related cases do not provide constitutional protection from any state action that has the ultimate effect of disturbing the tranquility of the parent-child relationship. If they did, one can imagine endless claims brought under § 1983, given the emotional immaturity of many teenagers and the frequently grating interactions between high school officials and students. In *Kelson* the Ninth Circuit did not intend to allow a claim for constitutional injury every time a school official's action (or inaction) with respect to a student caused the student to behave differently at home.

Thus, even if the Court construed the Amended Complaint to assert § 1983 claims by the parent Plaintiffs for interference with the parent-child relationship, the Defendants are entitled to summary judg-

ment on that claim, because the parent Plaintiffs have failed to allege facts that would allow a reasonable jury to find in their favor on a *Kelson* claim for § 1983 damages.

### C. Defendants' Motion for the Summary Judgment on All Student § 1983 Claims

Defendants move for summary judgment on every potential theory of liability under § 1983, arguing the Plaintiffs have failed to allege facts which if true would support a jury verdict for Plaintiffs on any § 1983 theory. The Plaintiffs oppose the motions. The potential theories upon which Plaintiffs may seek to establish § 1983 liability are (1) municipal liability on the part of the Powell County School District; (2) liability on the part of either the school district or the individual Defendants based on the existence of a state-created danger; and (3) individual § 1983 liability on a defendant-by-defendant basis.[2]

#### 1. Municipal Liability

 Municipalities or political subdivisions are liable under § 1983 when the offending actions are taken "pursuant to official municipal policy." *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may also be liable for a policy of inaction if such inaction amounts to a failure to protect constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Municipal liability does not arise, however, from respondeat superior or general liability theories. *Id.* at 385, 109 S.Ct. 1197 (citation omitted). Rather, a plaintiff must show (1) that plaintiff possessed a constitutional right of which he was deprived; (2) the

municipality had a policy, custom or practice; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992).

 Deliberate indifference "occurs when the need for more or different action is so obvious, and the inadequacy of the current procedure so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Id.* at 1477–78 (citations, internal quotation marks omitted). The failure to adequately implement a policy may form the basis of municipal liability if the failure in itself constitutes a policy of deliberate indifference. *Berry v. Baca*, 379 F.3d 764, 768 (9th Cir.2004). Whether a municipality has pursued a policy of deliberate indifference is generally a question for the jury. *Pearce*, 954 F.2d at 1478 (citation omitted). A policy is the moving force behind a constitutional violation if it caused the violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell.* Rather, the policy must be the proximate cause of the section 1983 injury." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837, (9th Cir.1996) (citations omitted).

Plaintiffs allege that municipal liability exists in this case based on the failure to adequately implement the Powell County High School security policy. Plaintiffs note the arguably common practice of school officials allowing students to have access to the keys to the school. To sup-

---

**2.** Plaintiffs do not assert any claim for relief based on the existence of a special relationship between the school Defendants and the

female students. Pl's Second Amended Reply Brief at 8.

port the argument, they point to the following specific examples: football coach Al Cutler had a practice of letting students "earn" keys and of leaving the weight room window open after hours; Cutler loaned students his full key ring so athletes could open doors to athletic facilities during supervised open gym sessions; Bob Schalk loaned his keys to students he believed were responsible, including Newman; Defendant Brott, PCHS Superintendent, gave keys to his children; PCHS student Austin Micu kept a set of keys atop the school trophy case with the knowledge of Cutler and Defendant Ron Fuhrman, the wrestling coach; staff, including Brott, found students in the school unsupervised when the school was supposed to be closed and the incidents "were ignored;" doors were frequently left unlocked or ajar; and many locks did not work.

For these facts to be actionable on Plaintiffs' municipal liability claim, they must satisfy the following elements: (1) that Plaintiffs possessed a constitutional right of which they were deprived; (2) Powell County School District had a policy, custom or practice; (3) the policy amounts to deliberate indifference to the Plaintiffs' constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Oviatt*, 954 F.2d at 1474. Here the Plaintiffs' claim is based on the failure to implement the security policy, which they argue amounts to a policy of deliberate indifference.

■ The Defendants argue that the facts do not support a finding of municipal liability even when viewed in the light most favorable to the Plaintiffs. The failure to implement the policy must amount to deliberate indifference. As noted above, deliberate indifference occurs when the need for more or different action is so obvious, and the inadequacy of the current procedure so likely to result in the viola-

tion of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need. Here, there is nothing to suggest that there was an obvious need for the school to take different action to protect identifiable constitutional rights. It was uncommon for teachers and administrators to entrust students with keys during the school day or supervised practice sessions so that the student could unlock a door. The teachers at Powell County High School regarded that practice as reasonable. Arguably such a practice could result in a proliferation of keys leading to an undesirable amount of student access to the school building as well as spaces and places within the building. In that sense, it can be credibly argued that the practice of occasionally giving select students access to the keys to the school and the failure inspect and maintain all internal and external locks is negligent in creating the risk of unauthorized student access to the school. Even so, for municipal liability to exist, a policy of inaction must be more than mere negligence. *See Daniels v. Williams*, 474 U.S. 327, 333–36, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The deliberate indifference analysis is also tied to the question of causation, another element the Defendants maintain is unsupported by the facts. Plaintiffs' argument on causation is that "the District's poorly implemented security policy was the moving force behind the constitutional violations simply because it provided Frankforter, Newman and Thomas ease of access to the locker rooms. Had even some of the issues discussed above been adequately addressed, the security breaches could have been prevented."

Because the Plaintiffs have produced no evidence to demonstrate that the boys used keys to enter the girls' locker room, and because the boys testified that they

never used keys to access the school after hours, the failures in implementing the security policy are not related to the availability of keys. Rather, the causation inquiry is necessarily limited to those shortcomings in the implementation of the security policy that actually facilitated the boys' access. Those failures are that internal and external doors were occasionally left open and that locks sometimes failed. It extends to loaning keys to the boys which gave them access to the training room for a power source.

The Plaintiffs can only succeed on the causation requirement if a reasonable jury could find the listed shortcomings were the moving force behind and the proximate cause of the constitutional violation. The proposition is dubious in light of the boys' testimony that they got into the locker room without keys and conducted the bulk of the intrigue during the school day when the building was wide open. Even if the failure to lock doors was the moving force behind the constitutional violations, the bizarre scheme carried out by the boys was not a reasonably foreseeable consequence of the school's failure to implement its security policy.[3] Summary judgment in the Defendants' favor is appropriate on the municipal liability claim because the Plaintiffs have failed to allege facts to support a finding of the requisite elements of deliberate indifference or causation.

## 2. State–Created Danger

 A municipality or political subdivision may be found liable under § 1983 where a plaintiff is deprived of constitutional rights by a private actor as a result of a state-created danger. *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir.1998). The "state-created danger" theory is a potential source of both individual and municipal liability, and is viewed as an exception to the rule that municipal liability may not be based on the acts of private individuals. *Id.* at 1058–59; *L.W. v. Grubbs*, 92 F.3d 894 (9th Cir.1996). The test for such liability requires that the plaintiff show "[1] that the state official participated in creating a dangerous condition, and [2] acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it." *Grubbs*, 92 F.3d at 900. The "deliberate indifference" standard requires the plaintiff to show "(1) an unusually serious risk of harm ..., (2) defendant's actual knowledge of (or at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *Id.* A defendant will not be liable under the state-created danger theory unless the defendant's actions in creating the dangerous condition are the proximate cause of the constitutional injury. *Van Ort*, 92 F.3d at 837. Proximate cause requires that the private actor's actions be a foreseeable result of the state official's participation in the creation of a dangerous condition. *Id.* Thus the unforeseeable acts of private actors break the chain of causation between the actions of a state official and the alleged constitutional violation. *Id.*

---

**3.** The Plaintiffs argue that *Van Ort's* proximate cause rule does not apply because the boys were state officials acting under color of state law as towel boys. Plaintiffs argument is inapposite in the municipal liability context because to the extent the boys gained access due to their role as towel boys, they did not gain that access as a result of the school's failure to implement its security policy, meaning the failure to implement the policy did not cause the constitutional injury. Moreover, because it is undisputed that the boys were not charged with implementing the security policy, they are unforeseen actors who break the chain of causation regardless of their status. *See Van Ort*, 92 F.3d at 837. If the Plaintiffs' goal was to place at issue the boys' status as actors under color of state law, they should have named the boys as defendants.

1072

Plaintiffs allege the existence of a state-created danger "because of the state's policy of hiring teenage boys to act as towel boys for teenage female athletes." To succeed in their claim Plaintiffs must show that a state official participated in creating a dangerous condition, and acted with deliberate indifference to the known or obvious danger in subjecting the Plaintiffs to it. To begin, no a reasonable juror could find that the "policy" of hiring towel boys was the proximate cause of the taping scheme. It is not foreseeable that the act of hiring a teenage towel boy puts female students in known or obvious danger of violation of their constitutional rights by surreptitious videotaping through two-way mirrors. One of the requirements of liability under the state-created danger theory is that the constitutional injury be a foreseeable consequence of the officials' actions. *See Huffman*, 147 F.3d at 1061. No reasonable juror could find that the particular constitutional injury claimed by the female student Plaintiffs was a foreseeable consequence of the employment of male towel boys. Consequently, summary judgment in the Defendants' favor is warranted with respect to the state-created danger theory under § 1983.

### 3. Individual Liability Under § 1983

Section 1983 provides for individual personal liability for any person who acts under the color of law and subjects another person to a loss of constitutional rights. Plaintiffs seem to claim individual liability on two different theories. First, they allege that some of the Defendants, most likely Joe Brott, Rick Duncan and Don McDermid, are subject to supervisory or vicarious liability based on the actions of the videotaping boys. This argument is premised on the notion that two of the boys were part-time school employees. Plaintiffs also allege that Pat Bannon, Don McDermid, Rick Duncan, Ron Fuhrman and Joe Brott are individually liable for

their own inaction in failing to address the asserted constitutional violation once they became aware of it.

In the Ninth Circuit, an individual supervisor may not be found liable under § 1983 for the acts of a subordinate on a theory of respondeat superior or supervisory liability. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) ("A supervisor is only liable for the constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under § 1983.").

Thus, Plaintiffs' claims for individual liability must be based on the failure of the individual Defendants to take action to prevent a known or obvious violation of constitutional rights. To prevail on such a claim, the plaintiff must show "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). To be liable under § 1983, the plaintiff must show that the deliberate or affirmative act or omission of the defendant caused the deprivation of constitutional rights. *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir.1989). In this case, because there is no claim individual Defendants took part in the surreptitious taping, the Plaintiffs need to bring forth proof that there was a failure to stop the scheme once the Defendants learned of its existence. In this context, mere negligence is insufficient to meet the legal requirements of § 1983. *Stevenson*, 877 F.2d at 1440 (citing *Daniels*, 474 U.S. at 332, 106 S.Ct. 662). "In the context of constitutional torts, it is the deliberate, intentional abuse of governmental power for the purpose of depriving a person of life, liberty or property that

the fourteenth amendment was designed to prevent." *Id.* at 1440–41. Accordingly, the plaintiff must show that the defendant acted with "deliberate indifference" to constitutional rights, which is done by showing "(1) an unusually serious risk of harm ..., (2) defendant's actual knowledge of (or at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir.1996) (citing *Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.1992)).[4]

■■■ Defendants seek summary judgment on the individual § 1983 claims made against each of the individual Defendants. To prevail on their claims with respect to any one of the individual Defendants, Plaintiffs must allege facts which if true would establish that the deliberate or affirmative act or omission of the defendant caused the deprivation of constitutional rights. The Plaintiffs argue that each of the Defendants was put on constructive notice of the constitutional claim by the conversations between students on school grounds regarding the tapes and by the students viewing the tapes during school hours. These facts do not show that any of the Defendants heard of the scheme or saw the tape. The law requires knowledge or willful blindness. The allegations and inferences here do not meet the requirements of knowledge or willful blindness to a known, serious risk.

With regard to McDermid and Fuhrman, Plaintiffs allege that each was present in the locker rooms on a regular basis and should have discovered the scheme had they "given even a cursory glance" to the two-way mirror or the cords along the walls. Plaintiffs also claim that McDermid was responsible for supervising Newman and Frankforter, and that Fuhrman knew that students had keys to the school. None of the facts alleged by the Plaintiffs, even if true, meets the deliberate indifference required to invoke individual liability. The Defendants' failure to be attentive, or more attentive, in the locker room or to supervise the boys more closely is a negligence claim. Negligence is insufficient to support a finding of individual § 1983 liability. Moreover, since the boys did not use keys to access the school, Fuhrman's alleged knowledge that students had keys is not probative of the issue of personal liability. The facts known to McDermid and Fuhrman did not give them knowledge of an obvious risk of violating another's constitutional rights. Summary judgment is granted on all of the Plaintiffs' § 1983 claims against McDermid and Fuhrman.

Defendant Pat Bannon allegedly read the comments of two students in the yearbook. By failing to explore the juvenile remarks Bannon is alleged to have violated the female students constitutional rights. Once again, this allegation sounds in negligence. Even then the claim that Bannon's failure to act constitutes negligence is tenuous. His failure to investigate crude yearbook comments does not constitute deliberate indifference as required by § 1983. Summary judgment is granted in Bannon's favor on the § 1983 claims against him.

---

4. There does not appear to be any reason why the Ninth Circuit's deliberate indifference formulation in the failure to act context would differ from that used in the state-created danger context. The difference between the tests for individual liability for failure to act and individual liability for a state-created danger, if one exists, is that the state-created danger theory requires participation of the state official in creating the dangerous condition, while the failure to act theory simply requires that the state actor learned of a risk of violation of constitutional rights and acted with deliberate indifference toward the risk. See *Grubbs,* 92 F.3d at 900.

■ Defendant Duncan supposedly had actual notice of the claimed constitutional violation based on the following argument in Plaintiffs' Brief:

Nancy Pembleton reported that the existence of the locker room tapes was discussed in a staff meeting in the spring of 2002 by Duncan. Subsequently, she testified that this meeting occurred in 2003 based on her memory that it occurred the year after her husband's death, which she thought was in 2002. Defendants now acknowledge that Ms. Pembleton's husband, in fact, died in 2001. This suggests her original testimony is correct.

There is no other testimony, from Duncan or any other person in attendance, of the discussion of the locker room tapes at a staff meeting in the spring of 2002. Pembleton's position is that she misspoke when she reported the date of the meeting as spring of 2002 in her deposition. The arguably confused testimony of Nancy Pembleton is the only evidence Plaintiffs present in support of their claim that Rick Duncan had notice of the contrivance to video tape girls in various states of dress. Alone, the testimony and any reasonable inference is not sufficient to defeat summary judgment in the absence of any other proof of Duncan's knowledge or willful blindness to an obvious risk to the female students' constitutional rights. "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Accordingly, summary judgement in Duncan's favor on the Plaintiffs' § 1983 claims against him is warranted.

■ Superintendent Brott was informed of the high school girls' suspicions in the winter of 2001–02 by Arlita Fenner, when she told him, "The girls think they're being videotaped." Brott told Fenner he would "take care of it," but then did nothing. The Plaintiffs argue that Fenner's statement to Brott shows that Brott had knowledge of facts that give rise to the risk invading the constitutional rights of the girls. The argument is that these facts alone satisfy the deliberate indifference standard.

Defendants look to the Third Circuit case of *D.R. v. Middle Bucks Area Voc. Tech. Sch.*, 972 F.2d 1364, 1376 (3rd Cir. 1992), in which the plaintiff high school students sued school officials for failure to prevent other students from sexually and physically abusing them during art class. The plaintiffs alleged that the school's assistant director had an obligation to act to prevent the assaults after receiving a report from one of the victims of a fellow student's efforts to force the victim into the bathroom for the purpose of engaging in sexual conduct. *Id.* at 1366. In considering the plaintiffs' argument for liability under the state-created danger theory, the court rejected the plaintiffs' position that the school officials were liable under the constitution for failing to address the physical and sexual abuse. The court found that the allegations that school officials failed to investigate after being advised of the misconduct "show nonfeasance but they do not rise to the level of a constitutional violation." *Id.* at 1376. The *Middle Bucks* court concluded that the plaintiffs failed to "demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants." *Id.* Defendants argue that Brott's failure to investigate does not satisfy the deliberate indifference standard set forth in *Middle Bucks*.

Plaintiffs argue that the *Middle Bucks* opinion is inapposite because it deals with deliberate indifference in the context of the state-created danger theory rather than in the context of individual liability for failure to act. Plaintiffs direct the Court's attention instead to *Flores v. Mor-*

*gan Hill Unified School Dist.*, 324 F.3d 1130 (9th Cir.2003). In that case, former students brought § 1983 claims against individual school employees based on the employees' alleged failure to respond to complaints of student-to-student anti-homosexual harassment. The student victims alleged that the school officials' failure to take steps to stop the harassment violated their right to equal protection under the Constitution. In denying the defendants' motion for summary judgment on the question of deliberate indifference, the Court wrote,

> The record contains evidence that Assistant Principal Maxine Bartschi failed to follow-up or conduct an independent investigation after two of the plaintiffs reported to her that they were assaulted by a group of students in the Live Oak High School parking lot. Bartschi's sole response was to tell the students to report the incident to a campus police officer. According to the plaintiffs, Bartschi took no action to locate or discipline the harassing students. The jury may find deliberate indifference despite Bartschi referring the girls to the campus police.

*Flores*, 324 F.3d at 1135–36 (citation omitted).

The *Middle Bucks* case, like the one now before the Court, deals with a claim for denial of the right to be secure in one's person as guaranteed by the Due Process clause of the Fourteenth Amendment. 972 F.2d at 1368 (citing *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). While the Plaintiffs are correct that the *Middle Bucks* case discusses deliberate indifference in the context of the state-created danger theory rather than a failure to act theory, they have not offered, and there does not appear to be, a reason to distinguish between the two. As noted above, they are closely related theories of liability for violation of the same constitutional right. The differ-

ence between the state-created danger test and the failure to act test is that the state-created danger test requires a showing that the state actor participated in creating the dangerous situation. With regard to the deliberate indifference element, there is no conceptual reason why the standard should differ between the two theories.

The *Flores* case, by contrast, deals with the alleged violation of an entirely distinct constitutional right, that to equal protection under the law as secured by the Equal Protection clause of the Fourteenth Amendment. The Plaintiffs in this case do not allege an equal protection violation, and the differences between the Equal Protection and Due Process clauses suggest that the analysis in *Flores* does not apply to this case.

The court in *Flores* employed a deliberate indifference standard, stating that deliberate indifference would be found "if the school administrator respond[s] to known peer harassment in a manner that is ... clearly unreasonable." 324 F.3d at 1135 (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). *Davis* is a Supreme Court case in which the Plaintiff brought a claim for denial of access to education opportunity under Title IX of the Education Amendments of 1972. Like *Flores*, *Davis* does not involve an allegation of denial of the due process right to be secure in one's person.

The distinction between the deliberate indifference standard set forth in *Flores* and *Davis* and the deliberate indifference standard that applies in this case is evident from the references in *Flores* and *Davis* to conduct that is "clearly unreasonable." Notions of reasonableness are the root of the concepts of negligence and the failure to exercise due care. The Ninth Circuit cases construing "deliberate indifference"

in the due process context have made clear, however, that ordinary negligence is not the standard for finding a violation of the due process right to be secure in one's person. *See Stevenson,* 877 F.2d at 1440. The Supreme Court has held that something more than gross negligence is required before the protections of the Due Process clause may be invoked. *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. To hold school officials liable for due process violations caused by their unreasonable conduct "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," an approach the Ninth Circuit has rejected. *Stevenson,* 877 F.2d at 1440. In this case, the deliberate indifference analysis as formulated in *Grubbs,* 92 F.3d at 900, and *Stevenson,* 877 F.2d at 1440, as well as *Middle Bucks* and *City of Canton* will be applied.

Assuming the facts as alleged are established, Defendant Joe Brott's conduct in failing to investigate further Arlita Fenner's report as a matter of law does not constitute deliberate indifference. According to Fenner's testimony, she told Brott, "The girls think they're being videotaped." That information alone did not apprize Brott of a known or obvious risk to constitutional rights. The statement did not inform Brott of the location of the alleged videotaping or even whether it was occurring on school grounds. At most, Fenner made Brott aware of a rumor that warranted further investigation. It has not been shown, however, that Brott demonstrated willful blindness to the taping scheme. Although the clarity of hindsight allows us to appreciate the magnitude of the invasion of privacy then occurring, it cannot be used to magnify Brott's negligence or culpability. His conduct must be judged based on what he knew at the time. Certainly Brott could have done more; he could have inquired further of Fenner as

to the specific basis for the girls' suspicions, or asked her to name the girls so he could question them himself. Upon further investigation, it is possible—but not certain—that Brott would have gained actual knowledge of the scheme. At that point, the Constitution would require that he take obvious steps to address the problem. The Constitution does not, however, require that Brott undertake such an investigation simply because there was some cause for suspicion. The following passage from the *Middle Bucks* opinion aptly describes the limitations of § 1983 liability in this case:

> We readily acknowledge the apparent indefensible passivity of at least some school defendants under the circumstances. Accepting the allegations as true, viz., that one school defendant was advised of the misconduct and apparently did not investigate, they show nonfeasance but they do not rise to the level of a constitutional violation. As in *DeShaney*, "[t]he most that can be said of the state functionaries is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."

972 F.2d at 1376 (quoting *DeShaney v. Winnebago,* 489 U.S. 189, 203, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

The Plaintiffs have failed to allege facts that would allow a reasonable juror to find that Defendant Brott acted with deliberate indifference. As a result, Brott is entitled to summary judgment in his favor on the Plaintiffs' § 1983 claims.

Because no claims remain over which this Court has original jurisdiction, it is necessary to consider whether to remand the case to state to resolve the state causes of action.

## D. Supplemental Jurisdiction Over the Remaining State Law Claims

■ A federal district court has supplemental jurisdiction over claims under state law that arise from the same case or controversy as the claims over which the court has original jurisdiction. 28 U.S.C. § 1367(a). Upon a determination that the federal claims lack merit, the district court may retain jurisdiction, dismiss the case or remand the case to state court, depending on the circumstances. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n. 7, 108 S.Ct. 614.

■ This case is one in which the balance of factors dictates that the Court decline to exercise jurisdiction over the remaining state law claims. The Montana Third Judicial District Court has heard several cases, both civil and criminal in nature, stemming from the videotaping scheme at issue in this case. It is the court most familiar with the facts of this case and thus the most appropriate forum from the standpoint of judicial economy and convenience. It is the court that harbors the questioned tapes and analysis of them. Moreover, Montana courts have a greater interest in deciding this case, as Montana laws are at issue. However, because this case was not removed from the state court, remand is not an option. Carnegie-Mellon, 484 U.S. at 351. Instead, the Court must dismiss the case, without prejudice as to Plaintiff's claims under Montana law. Dismiss of the state claims without prejudice results in a one-year extension of any applicable statute of limitations, see § 27-2-407, Mont. Code Ann.,

allowing the Plaintiffs to reassert their claims under Montana law in the Montana court.

Because the state law claims are dismissed without prejudice, I will not consider the individual Defendants' motion for summary judgment on state law immunity grounds.

## IV. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that the Defendants' motion for summary judgment on the parent Plaintiffs' derivative § 1983 claims (dkt # 384) is GRANTED, Defendants' motion for summary judgment on student Plaintiffs' § 1983 claims (dkt # 381) is GRANTED, and the Plaintiffs' pendent state law claims are DISMISSED without prejudice.