BYBEE, Circuit Judge,
dissenting:
I vigorously part company with the majority’s conclusions that Shields created the danger that Kennedy faced and that he acted with deliberate indifference in doing so, thereby violating her rights under the Due Process Clause of the Fourteenth Amendment. The majority’s conclusion is unsupported by the record and our own case law. The majority concludes that in the fifteen minutes between the time Officer Shields contacted Angela Burns and the time he advised Kim Kennedy of the contact, he deprived Kennedy of her due process rights. In so holding, the majority *1068 not only mangles the state-created danger doctrine, it holds that its new rule was so clearly established that Officer Shields should have known he was violating the Constitution and, thus, has forfeited his qualified immunity.
We have never before recognized a state-created danger cause of action on facts remotely analogous to these. In the sixteen years since we introduced the state-created danger exception to DeSha-ney into our case law, we have approved its application on fewer than five occasions. In these cases, we have narrowly construed the exception to encompass only those claims in which the government’s action was directed at a specific plaintiff, rather than the public at large; the government acted affirmatively, rather than simply failed to act; the government’s act caused the harm, rather than merely increased the risk; and the government’s action constituted deliberate indifference to the known or obvious danger, rather than mere — or even gross — negligence. Ignoring these elements, the majority today extends the state-created danger doctrine to a situation in which it cannot be said with any measure of confidence either that the government’s act caused the plaintiffs harm or that the government acted with the requisite level of culpability.
Even if I thought Officer Shields had violated our state-created danger gloss on the Due Process Clause, the violation was surely not so obvious that he should have known at the time that he was violating Kennedy’s constitutional rights. ' Consequently, even assuming a constitutional violation, I would hold that Officer Shields is nonetheless entitled to qualified immunity. I respectfully dissent.[1]
I. BACKGROUND
The facts of this case are undeniably tragic. On September 6, 1998, Kennedy filed a complaint with the City of Ridge-field Police Department (“RPD”) accusing her thirteen-year-old neighbor, Michael Burns, of sexually molesting her nine-year-old daughter. Officer Shields was dispatched to Kennedy’s home to record the complaint.
Kennedy recalls talking with Officer Shields about the instability of the Burns family. She alleges that she informed Shields that the Burns family “had bad tempers” and that Michael was in trouble all the time, including one unfruitful investigation for allegedly sending a death threat to a classmate; he also once threw rocks at his stepfather’s building. On another occasion, Michael reportedly lit a cat on fire, and later unlawfully entered his girlfriend’s house “and went after her with a baseball bat” after she broke up with him. On the basis of this alleged misconduct, Kennedy requested prior notification before the Burns family was informed of her allegations.
Following her initial complaint, Kennedy repeatedly contacted the RPD — at least six times during the eighteen days following her complaint — -regarding the status of the investigation. On September 24, Kennedy called Officer Shields directly to determine whether the Burns family was aware of her allegations. Unable to reach Shields by phone, she left a message. In response to her inquiry, Shields proceeded to the Burnses’ home to ascertain whether the family had been notified. Shields was greeted by Angela Burns (Michael Burns’s mother) and Shields asked her whether she had received a phone call or visit from the Child Abuse and Intervention Center *1069 (“CAIC”). Angela Burns inquired as to the reason for his question, and Shields advised her of the allegations.
Immediately following this meeting, Shields drove directly to Kennedy’s residence — located approximately one block away — -and informed her that Angela Burns had been notified of her allegations. Kennedy alleges that she expressed fear regarding Michael Burns’s possible reaction. She further alleges that, in response to her expressions, Officer Shields promised to patrol the area that night to watch for Michael. After discussing the matter with her husband, Kennedy chose to remain in her home that evening and leave town the following morning. Michael Burns entered the Kennedy home that night, shot and killed Jay Kennedy, and seriously wounded Kim Kennedy. She now brings this action against Officer Shields, claiming that his conduct violated her rights under the Due Process Clause of the Fourteenth Amendment.
II. SAUCIER TWO-STEP
As the majority notes, the Supreme Court’s opinion in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), provides the framework for our analysis of this § 1983 suit. Under this framework, if a defendant claims qualified immunity, we must make two distinct inquiries: a “constitutional inquiry” and a “qualified immunity inquiry.” See Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir.2002).
Officer Shields claims that he is entitled to qualified immunity from Kennedy’s suit. Accordingly, Saucier instructs that we must first determine whether, “[tjaken in the light most favorable to the party asserting the injury ... the facts alleged show the officer’s conduct violated a constitutional right.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151. “[I]f a violation could be made out on a favorable view of the parties’ submissions, the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case” such that “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 201-02, 121 S.Ct. 2151 (citing Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).
The majority concludes that Kennedy’s allegations permit a jury to find that Officer Shields’s conduct deprived her of due process as guaranteed by the Fourteenth Amendment on the theory that Shields affirmatively created the danger that injured her and took her husband’s life. The majority holds, in addition, that Officer Shields is not entitled to qualified immunity for this violation. I disagree on both accounts. To explain my disagreement on the first point, it is worth briefly outlining this Court’s state-created danger doctrine.[2]
A. State-Created Danger Doctrine
As the majority observes, the state-created danger doctrine is said to trace its jurisprudential pedigree in this Circuit to the Supreme Court’s opinion in DeShaney, perhaps best known for Justice Blackmun’s exclamation, “Poor Joshua!” DeShaney v. Winnebago County Dep’t of Soc. Servs., 489 U.S. 189, 213, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (Blackmun, J., dissenting). Declining to find a due process violation where local officials failed to adequately respond to complaints that four-year-old Joshua was being abused by his *1070 father, the Court held that the Constitution does not require the state to protect the life, liberty, and property of its citizens against invasion by private actors. Rather, the Due Process Clause “is phrased as a limitation on the State’s power to act, not as a guarantee of certain minimal levels of safety and security.” Id. at 195, 109 S.Ct. 998. The Court observed,
Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression!!] Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes. Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.... [I]t follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.
Id. at 196-97, 109 S.Ct. 998 (internal quotation marks and citations omitted).
We have noted two distinct exceptions to the general rule that the state has no affirmative duty to protect persons from violence inflicted by private actors: (1) the “special relationship” exception, stemming from a custodial relationship between the state and the victim; and (2) the “danger creation” exception, stemming from “affirmative conduct on the part of the state in placing the plaintiff in danger.” L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992) (“Grubbs I ”). The former emanates from language in DeShaney itself. DeShaney, 489 U.S. at 199-200, 109 S.Ct. 998 (“[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.”). The latter, more amorphous, doctrine of “state-created danger” was developed by lower courts in response to the DeShaney Court’s observation that Winnebago County neither helped to create the dangers that Joshua faced nor rendered him more- vulnerable to those dangers. DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (“While the State may have been aware of the dangers that Joshua faced ... it played no part in their creation, nor did it do anything to render him any more vulnerable to them.”).
1. Ninth Circuit Cases
We established the state-created danger theory four months after DeShaney was published by recognizing a cognizable due process violation where the plaintiff alleged that she was raped after a state trooper impounded the vehicle in which she was riding, ejected her from the vehicle, and left her stranded in a high-crime area in the middle of the night. Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989). In holding that Wood raised a triable issue of fact as to whether Trooper Ostrander’s conduct violated her substantive due process rights, we drew a distinction between facts demonstrating that police action created the danger to the person and facts demonstrating a danger that existed without police action. Wood, 879 F.2d at 589-90. Relying on DeShaney, we held that a substantive due process claim could be stated when police create the danger to an individual. We reasoned that “[t]he fact that Ostrander arrested [the driver], impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. *1071 distinguished Wood from the general public and triggered a duty of the police.to afford her some measure of peace and safety.” Id. at 590. Reversing the district court’s summary judgment for defendants, we concluded that the plaintiffs allegations demonstrated “an assertion of government power which ... tends to show a disregard for [her] safety amounting to deliberate indifference.” Id. at 588.
We further defined the contours of the state-created danger theory in Grubbs I, in which a registered nurse employed by the state of Oregon at a medium-security custodial institution brought suit against state prison officials after she was battered, kidnapped, robbed, and raped by an inmate with known violent propensities. 974 F.2d at 120. The plaintiff alleged that she was led to believe that she would not have to work alone with residents who were known violent sex offenders. Id-Finding a cognizable due process violation, we emphasized that the state had knowledge of the inmate’s dangerous propensities, and it affirmatively assigned him a job in which he would work alone with the plaintiff. Id. at 121. We concluded that the defendants, like the officer in Wood, “used their authority as state correctional officers to create an opportunity for [the inmate] to assault [the plaintiff] that would not othenvise have existed.” Id. (emphasis added). We further observed that the defendants “enhanced [the plaintiffs] vulnerability to attack by misrepresenting to her the risks attending her work”; namely, by leading her to believe that she would not be assigned to work alone with any inmates who were known violent sex offenders. Id.
Contrary to the majority’s suggestion, the “enhanced vulnerability” that ensued from the state’s misrepresentation of the risks that the nurse would face in her employment did not, by itself, give rise to the due process violation recognized in Grubbs I. Maj. Op. at 1068, 1066-1067. Indeed, under DeShaney, it is, at the very least, questionable whether a state’s failure to fully apprise an -individual of the risks attending her employment can ever constitute an affirmative exercise of state power sufficient to give rise to a due process violation. See DeShaney, 489 U.S. at 201-02, 109 S.Ct. 998 (suggesting that the affirmative exercise of state power, as opposed to mere inaction, is the minimum threshold requirement necessary to establish a due process violation, and declining to find such affirmative exercise even in the context of an elaborate and exclusive system of child-protection services). Rather, Grubbs I more accurately stands for the proposition that, in order to state a claim based on state-created danger, the state must affirmatively play a part in creating the danger. See Grubbs I, 974 F.2d at 121 (“The ‘danger creation’ basis for a claim ... necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger.”); see also Munger v. City of Glasgow Police Dep’t, 227 F.3d 1082, 1086 (9th Cir.2000) (noting that the court in a state-created danger case “must determine whether [the state] did in fact affirmatively place [the plaintiff] in danger”).
In a second appeal in Grubbs, we addressed the level of culpability required to prevail under a state-created danger theory. See L.W. v. Grubbs, 92 F.3d 894 (9th Cir.1996) .(“Grubbs II ”). Explicitly rejecting a “gross negligence” standard, we held that “the plaintiff must show that the state official participated'in creating a dangerous situation, and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it.” Id. at 900 (emphasis added); see also Wood, 879 F.2d at 588.
Our subsequent cases have further demarcated the outer bounds of the state- *1072 created danger doctrine. These cases have only highlighted the requirement that, at a minimum, a due process claim must be based on an affirmative exercise of state power that creates a risk which, but for the state’s affirmative action, would not have existed. For instance, in Penilla v. City of Huntington Park, 115 F.3d 707 (9th Cir.1997), we found a due process violation where police officers responded to a 911 call, “examined [the plaintiff], found him to be in grave need of medical care, canceled the request for paramedics, broke the lock and door jamb on the front door of [the plaintiffs] residence, moved him inside the house, locked the door, and left.” Id. at 708. Under these circumstances, we determined that the state created a danger to the plaintiff which, but for its affirmative unlawful acts, would not have existed.[3] Likewise, in Munger, we found a cognizable due process violation where police officers ejected the plaintiff from a bar late at night when the outside temperatures were subfreezing. 227 F.3d at 1087. Although the officers knew that the plaintiff was intoxicated and was wearing only a t-shirt and jeans, they prevented him from driving his truck or reentering the bar. Id. at 1084-85. Presented with these facts, we held that the state affirmatively acted to place the plaintiff in danger that would not have existed without state action. Id. at 1087.
In those cases where we have declined to find a cognizable due process violation, we have generally emphasized the unforeseeable nature of the plaintiffs injuries, that the danger facing the plaintiff existed independent of state action, or the absence of the requisite mental state. For instance, in Huffman v. County of Los Ange-les, 147 F.3d 1054, 1061 (9th Cir.1998), we declined to find municipal liability under § 1983 where the plaintiff was shot during a barroom brawl with an off-duty deputy employed by the Los Angeles County Sheriffs Department. Finding that the risk to the plaintiff was an unforeseeable consequence of a county policy requiring off-duty officers to carry a firearm, we held that “the danger-creation plaintiff must demonstrate, at the very least, that the state acted affirmatively, and with deliberate indifference, in creating a foreseeable danger to the plaintiff, leading to the deprivation of the plaintiffs constitutional *1073 rights.” Id. (citations omitted); see also Lawrence v. United States, 340 F.3d 952, 957 (9th Cir.2003) (citing Penilla and Munger, and observing that “in each of the cases in which we have applied the danger-creation exception, ultimate injury to the plaintiff was foreseeable”). Similarly, in Lawrence, 340 F.3d at 954, we declined to find a Fifth Amendment violation in a Bivens action where a juvenile plaintiff alleged that she was sexually abused by a convicted drug offender participating in the Federal Witness Security Program; the plaintiff alleged that the offender could not have obtained employment át a group home where she was a resident but for the assistance of federal officers.[4] Although we found it foreseeable that a convicted drug offender might attempt to distribute illegal drugs to children with whom he came into contact, we found the plaintiffs injuries an unforeseeable consequence of the official action. Id. at 957.
Finally, in Nicholas v. Wallenstein, 266 F.3d 1083 (9th Cir.2001), the most factually similar case in our case law, county jail employees brought suit against the jail commander after he publicly disclosed the identities of employees who had been involved in the restraint and removal of a deceased prisoner. Upon learning their identities, the deceased prisoner’s family and friends harassed and assaulted the employees. Id. at 1085-86. Citing Wood, the employees contended that the state had acted with deliberate indifference because their supervisors did not promptly notify them of the release of their identities and did not take steps to protect them from the dangers that ultimately became apparent. Id. at 1087. We-ruled in favor of the state, finding that the plaintiffs had not established that the commander acted with deliberate indifference to known or obvious dangers, even though he knew when he released the records that the deceased prisoner’s family and friends believed that personnel connected with the jail were responsible for his death. Id. In doing so, we reasoned that the jail authorities could not have reasonably concluded that the prisoner’s family and friends would be likely to engage in open violence. Id. (“Knowing that the crowd was angry was hot knowing that they would take criminal measures to make the jailors or their health helpers pay.”).
2. Factors for Analysis
As our cases illustrate, we typically consider a, number of factors in determining whether the plaintiff has successfully stated a due process violation: (1) whether the act was directed toward a specific plaintiff or the public at large, see, e.g., Wood, 879 F.2d at 590 (reasoning that the state’s action “distinguish[ed].;[the plaintiff] from the general public and -trigger[ed] a duty of the police to afford her some measure of peace and safety”); cf. Huffman, 147 F.3d at 1061 & n. 4 (suggesting, but not deciding, that a plaintiff must show that “the danger created by a state official is directed toward a particular plaintiff, as opposed to being directed toward the general public”); (2) whether the government acted affirmatively or simply failed to act, see, e.g., Grubbs I, 974 F.2d at 121 (requiring “affirmative conduct on the part of the *1074 state in placing the plaintiff in danger”); Munger, 227 F.3d at 1086 (phrasing the inquiry as “whether [the state] did in fact affirmatively place [the plaintiff] in danger”); (3) whether the government’s act caused the harm, see, e.g., Grubbs I, 974 F.2d at 121 (finding state-created danger where the state’s action “create[d] an opportunity for [the inmate] to assault [the plaintiff] that would not otherwise have existed ” (emphasis added)); Penilla, 115 F.3d at 710 (same); Munger, 227 F.3d at 1087 (same); Ketchum v. Alameda County, 811 F.2d 1243, 1247 (9th Cir.1987) (“[T]here is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment.”) (quoting Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982)); and (4) whether the government acted with the requisite culpability, see, e.g., Grubbs II, 92 F.3d at 900 (requiring the plaintiff to show that the state official “acted with deliberate indifference to the known or obvious danger” (emphasis added)); Wallenstein, 266 F.3d at 1087 (same); Penilla 115 F.3d at 710 (same). Cf. Armijo ex rel. Chavez v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1264 (10th Cir.1998) (adding a fifth factor which considers whether the government completely removed all of the plaintiffs protection); Russell v. Gregoire, 124 F.3d 1079, 1093 n. 10 (9th Cir.1997) (stating, in dicta, that “a state has no general duty to protect individuals against potential harm by third parties unless the state creates the danger and removes the individual’s ability to protect himself’ (citations omitted)). These factors closely parallel those used by other circuits recognizing the doctrine. See, e.g., Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir.1995) (requiring the plaintiff to show that (1) he “was a member of a limited and specifically definable group; (2) Defendants’ conduct put [him] and the other members of that group at substantial risk of serious, immediáte and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking”). My disagreement with the majority’s findings and conclusions centers on the second, third and fourth factors.
The Supreme Court has yet to recognize the state-created danger doctrine, and the circuit courts have yet to construct a unified approach either to the state-created danger inquiry or to the role that causation principles should play in the analysis. However, each court recognizing the theory has required, at a minimum, a showing that the government’s act was the “but-for cause” that put the plaintiff in a position of danger she would not otherwise have faced. See, e.g., Carlton v. Cleburne County, 93 F.3d 505, 508 (8th Cir.1996)’(collecting cases and noting that in each case where a cognizable due process violation was found “the individuals would not have been in harm’s "way but for the government’s affirmative actions”); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993) (finding the evidence sufficient to support summary judgment for police officers where “without state intervention, the same danger would exist”); Salas v. Carpenter, 980 F.2d 299, 309-10 (5th Cir.1992) (holding a city not liable for declining assistance from a SWAT team and taking a hard line with a hostage taker); Jackson v. City of Joliet, 715 F.2d 1200, 1204-05 (7th Cir.1983) (holding officers not liable because they “did not create but merely failed to avert danger” by not rescuing victims from a burning car more promptly). We have never recognized a state-created danger where the state was merely a “proximate cause” rather than the cause-in-fact of the plaintiffs injuries. We *1075 have not imported common law tort principles to this doctrine. As the Supreme Court observed in DeShaney:
It may well be that, by voluntarily undertaking to protect [the plaintiff] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger.... But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.
489 U.S. at 201-02, 109 S.Ct. 998 (citations omitted). In short, our cases, as well as those of our sister circuits, demand that the state’s affirmative act must, at the very least, be the eause-in-fact of the plaintiffs injury.
My motive for further belaboring the federal reports with a dissent stems primarily from my conviction that Kennedy has not alleged facts sufficient to support a due process violation; her case against Officer Shields sounds in negligence, albeit negligence with tragic consequences. The majority has run afoul of our own cases and the Court’s caution in DeShaney. I address these issues more fully below.
B. Constitutional Inquiry
The majority finds fault with two of Officer Shields’s actions: (1) notifying Angela Burns of Kennedy’s allegations pri- or to informing Kennedy that he was about to do so;[5] and (2) promising to increase police surveillance on the night of the shooting. Maj. Op. at 1064-65. Neither of these, considered independently or together, will support a due process violation.
1. Notifying Burns Prior to Informing Kennedy
The majority concludes that Officer Shields “created an opportunity for Burns to assault the Kennedys that otherwise would not have existed.” Id. at 1063 (quotations omitted). Kennedy has not addressed how much advance warning she desired, nor whether she effectively communicated the extent of warning she desired to Shields; however, she insists that she made it clear that she wanted to be notified before the Burnses were informed of her allegations. The majority asserts that, had Kennedy received prior warning, she and her family would have had the opportunity to take additional precautions. Id. at 1063. The majority reaches this conclusion despite the fact that Shields warned her within fifteen minutes of his discussion with Angela Burns and that the Kennedys subsequently made a conscious choice to remain in their home for the evening. The majority finds this flipflop of no more than fifteen minutes to be of constitutional magnitude. As the Kennedys were shot many hours later, I do not see how receiving warning fifteen minutes earlier would have made any difference whatsoever. Nonetheless, in light of the information Kennedy communicated to Of *1076 ficer Shields regarding Michael’s past misbehavior, the majority holds that “Shields’s actions both created and aggravated the risk Plaintiff faced from Burns” Id. at 1067.
There is nothing in the record to support the claim that Shields increased the risk facing the Kennedy family by notifying Angela Burns of the allegations. Notifying Michael Burns was an inevitable consequence of Kennedy’s allegations of child molestation; at some point either the police or CAIC was going to have to talk with Burns about the allegations.[6] Kim Kennedy was anxious because she knew that Michael Burns would have to be informed, and she feared what he might do when he was. It was this fear that motivated her to contact pqlice at least six times to inquire whether the Burnses had been contacted yet. In none of these numerous phone calls did she. try to dissuade the authorities from ever contacting Burns; she knew that it was only a matter of time. The dilemma for her was whether she would know when Burns was contacted, and would therefore be able to take precautions. To that end, she made every effort to ensure that she would be notified when Burns was made aware of these charges.
Prior to the shooting, Kennedy’s only direct contact with law enforcement officials was with Officers Shields and Doriot of the RPD. However, pursuant to an inter-local agreement, the task of investigating Kennedy’s molestation complaint was performed solely by a separate law enforcement unit, the Child Abuse Intervention Center (“CAIC”). So far as Shields knew, Kennedy had had no contact with CAIC and was relying on conversations with him and Officer Doriot to monitor the case. Shields had no authority over CAIC, and therefore had no way of ensuring that Kennedy received notification before CAIC made contact with the Burns family regarding her allegations. Indeed, from Shields’s perspective, he represented Kennedy’s best chance of receiving timely notification of any contact with the Burnses. Judging from Kennedy’s repeated calls to Shields, Kennedy took a similar view.
The majority’s statement that “[o]f all the possible actions [Shields] could take, ... he took the one most feared by Kennedy” is simply false. Maj. Op. at 1065. The scenario Kennedy most feared was that Burns would become aware of the allegations and she would not know, and therefore would not be able to take appropriate precautions. Thus, when Shields decided to inform Burns of the allegations himself, he was ensuring that Kennedy was spared the possibility she feared most — that Burns would be notified and she would be unaware. And, by Kennedy’s own testimony, Officer Shields informed her immediately after contact was made, at approximately 4:30 in the afternoon.
The majority attempts to shoehorn Shields’s behavior in this case into the mold of the supervisor in Grubbs I. This is an exceedingly poor analogy. The supervisor in Grubbs I created the danger to the *1077 detention center nurse by essentially ordering her to work alone with a known violent sex offender. If he had not done so, the nurse would presumably never have been alone with the offender, and would therefore not have been in any- danger from him. Here, Burns would have to be informed eventually; the only question was whether Kennedy would know that he had been informed. Nor did Shields facilitate Michael Burns’s access to Kennedy. Unlike the nurse in Grubbs, Kennedy was well aware that she was already exposed to a very real danger, and that this danger existed apart from any action or conduct by Officer Shields. Rather than increasing the risk facing the Kennedy family, Shields’s prompt notification appears to have given Kennedy her best chance for escape.
Yet, even if Officer Shields had increased the risk facing the plaintiff, this would not constitute a due process violation. See, e.g., Huffman, 147 F.3d at 1061 (“The danger-creation exception to DeShaney does not create a broad rule that makes state officials liable under the Fourteenth Amendment whenever they increase the risk of some harm to members of the public.”). The City of Ridgefield did not create Michael Burns’s violent reaction any more than Winnebago County created the violent beatings that resulted in brain damage to Joshua DeShaney. See DeShaney, 489 U.S. at 193, 109 S.Ct. 998. The majority’s holding impermissibly circumvents DeShaney by redefining the cause of action as one premised on a “state-created danger.” I therefore cannot support the majority’s holding that, like the supervisor in Grubbs I, Shields created “an opportunity for Burns to assault the Kennedys that otherwise would not have existed.” Maj. Op. at 1062-1063 (emphasis added) (quotations omitted); Grubbs I, 974 F.2d at 121.
Nor can Shields’s conduct be characterized as manifesting “deliberate indifference” to the dangers faced by the Kennedys. As the majority acknowledges, “the standard in this circuit [is]’ not gross negligence but ‘deliberate indifference to a known, or so obvious as to imply knowledge of, danger.’ ” Maj. Op. at 1065; see Grubbs II, 92 F.3d at 898; see also DeShaney, 489 U.S. at 201-02, 109 S.Ct. 998. Grubbs II’s deliberate indifference standard requires a showing that the “ ‘defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff.’ ” Grubbs II, 92 F.3d at 899 (quoting Uhlrig, 64 F.3d at 573 n. 8). Phrased another way, the defendant must “have actual knowledge of, or willfully ignore, impending harm,” meaning “the defendant knows that something is going to happen but ignores the risk and exposes someone to it.” Id. at 900 (emphasis in original).[7]
*1078 Even if Officer Shields knew of Michael Burns’s propensities — the allegations that he had threatened a classmate, tortured a cat, and assaulted his girlfriend — Shields could not have anticipated as an “obvious consequence” that Michael would enter the Kennedys’ home and murder Jay and assault Kim. See Maj. Op. at 1064; Wallenstein, 266 F.3d at 1087. Although his previous misconduct included disturbing juvenile violence, nothing in his record should have made it obvious that the thirteen-year-old Burns might attempt to murder members of the Kennedy family with a firearm. Indeed, the record suggests that both Shields and the Kennedys failed to appreciate the extent of the danger that Michael posed. Under these circumstances, it cannot be said that Officer Shields had “actual knowledge of, or willfully ignore[d], impending harm.” Grubbs II, 92 F.3d at 900; see also Wallenstein, 266 F.3d at 1087 (“[It] has not been shown ... that ... [friends and family of the deceased prisoner] would have the capacity and sustained desire to wreak vengeance on the officers and nurses involved [with his death].”).
Even assuming, arguendo, that Shields recognized the risk that Kennedy faced from Burns, his actions can hardly be said to demonstrate “deliberate indifference” to it. Even if Shields’s actions were misguided in hindsight — and it is not clear that any other reasonable officer would not have done the same thing — all the' evidence suggests that he was motivated by a desire to ensure that Kennedy would know exactly when Burns became aware of her daughter’s allegations. There is simply no evidence that Shields acted with deliberate indifference to any known or obvious risks Kennedy faced.[8] Without the requisite mental state, there can be no constitutional violation premised on state-created danger. See, e.g., Grubbs II, 92 F.3d at 898; Wood, 879 F.2d at 588. I would hold that Kennedy failed to state a constitutional violation arising from the prompt notification that she received regarding Shields’s contact with Angela Bums.
2. Promising Police Surveillance
The majority correctly recognizes that officer Shields’s assurances of a police patrol on the evening of the shooting do not provide an independent basis for a due process violation. Maj. Op. at 1064 (“[W]e do not rest our judgment that Shields affirmatively created a danger on that assurance ....”). However, I cannot agree with the majority’s contention that, by assuring Kennedy “that the police would patrol the area,” Shields somehow aggravated the risks that Kennedy faced. Id. at 1058; id. at 1064 (“Instead, [it] was an additional and aggravating factor, making [Kennedy] more vulnerable to the danger he had already created [by notifying Burns of the allegations against him before telling Kennedy that he was about to do so].”). Kennedy does not claim that the RPD failed to patrol the area on the evening of the shooting, nor does she allege that Officer Shields made any false claims to her about the efficacy of police patrols in providing protection in similar cases. I do not see how Officer Shields’s statement that the police would patrol the area made the Kennedys “more vulnerable.” See DeSha-ney, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (finding multiple attempted but failed interventions by social services *1079 insufficient to create a due process violation); Balistreri v. Pacific a Police Dep’t, 901 F.2d 696, 700 (9th Cir.1988) (citing DeShaney and declining to find a due process violation where the plaintiffs allegations amounted to the assertion that “state actors knew of her plight and affirmatively committed to protect her”).
The majority attempts to justify its statement by analogizing the facts of this case to those of Grubbs I. This comparison does not help the majority’s case. In Grubbs I, we relied on the state’s misrepresentation merely as a means for bolstering our conclusion that the state’s affirmative act of directly placing the plaintiff in a dangerous situation — namely, assigning her to work alone with a known violent sex offender — created a risk that would not otherwise have existed. See Grubbs I, 974 F.2d at 121; see also Munger, 227 F.3d at 1086 (noting that the court in a state-created danger case “must determine whether [the state] did in fact affirmatively place [the plaintiff] in danger”). Here, Kennedy does not allege that the government lied about the risks she would face, but rather that she relied on government protective measures which failed her. While it is undeniably tragic that police patrols were unsuccessful in preventing Burns’s attack, this is categorically different from Grubbs I, where the government actively misrepresented the risks facing the plaintiff. I therefore believe the majority’s reasoning on this issue to be flawed.
In sum, I would hold that Kennedy failed to establish a due process violation arising from Officer Shields’s actions either in notifying Michael Burns of her allegations prior to warning her, or in offering to increase surveillance on the evening of the shooting. Accordingly, I would hold that she failed to establish a cognizable due process violation premised on state-created danger.
C. Qualified Immunity Inquiry
Even assuming that Kennedy has established a due process violation premised on state-created danger, in order to bind this case over for trial we must determine that the constitutional right at issue was ‘‘clearly established” at the time of the events in question. We must hold that a “reasonable official” in Officer Shields’s position “would understand that what he is doing violates that right,” Saucier, 533 U.S. at 202, 121 S.Ct. 2151, keeping in mind that “officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law.” Butz v. Economou, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Indeed, “[e]ven defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard.” Davis v. Scherer, 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). As the Court has repeatedly emphasized, “the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); see also Burns v. Reed, 500 U.S. 478, 494-95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Particularly in a context where the potential for liability may chill lawful and socially desirable behavior at the edge of the “forbidden zone,” qualified immunity ensures that “officials can act without fear of harassing litigation” and “can anticipate when their conduct may give rise to liability for damages.” Davis, 468 U.S. at 195, 104 S.Ct. 3012.
Imbued with notions of “reasonableness” and “fair warning,” the “concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] *1080 conduct.” Saucier, 533 U.S. at 205, 121 S.Ct. 2151. The central dispositive inquiry-essential to finding a right “clearly established” is “whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 202, 121 S.Ct. 2151. Importantly, our analysis must acknowledge and evaluate the specific context of the situation confronted by the official. Id.; see also Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (“It is important to emphasize that this inquiry ‘must be undertaken in light of the specific context of the case, not as a broad general proposition.’ ” (quoting Saucier, 533 U.S. at 201, 121 S.Ct. 2151)). With these instructions in mind, I have no hesitation in concluding that Officer Shields is entitled to qualified immunity.
The majority holds that Officer Shields’s behavior violated Kennedy’s clearly established constitutional rights because it finds the case “not ‘meaningfully distinguishable’ from Grubbs.” Maj. Op. at 1066. I disagree. Grubbs I does not even begin the heavy lifting necessary to sustain the majority’s conclusions.
The majority writes that “[i]n Grubbs, as in this case, a state official affirmatively acted: supervisor Grubbs assigned a violent sex offender to work closely with [the nurse], and Officer Shields notified Burns, leaving Kennedy unable to protect her family.” Id. at 1067. Indeed, Shields did take an affirmative act. However, the danger in Grubbs — being alone with a known violent sex offender — was entirely avoidable, while the danger in this case— that Burns might react violently when he discovered the allegations against him— was not within Shields’s control. The only danger that Shields was able to ameliorate was the possibility that Kennedy would not be aware that Burns had learned of the allegations against him; Shields did, in fact, prevent this scenario. Moreover, in Grubbs, the supervisor made false representations so that the victim could not evaluate her level of danger and take appropriate precautions. Here, Shields made no misrepresentations and Kennedy already knew the risks. I therefore find the majority’s statement that, “At bottom Kennedy’s claim is exactly like [the nurse in Grubbs ], i.e., that a state actor ‘enhanced [her] vulnerability to attack by misrepresenting to her the risks’ she faced” mystifying. Id. at 1067.
The majority further likens this case to Grubbs because Shields’s action “made plaintiffs vulnerable to a particularized danger they would not have faced but for that action.” Id. at 1067 (emphasis added); see also id. (“[I]n this case, as in Grubbs, Shields used his ‘authority as a state ... officer to create an opportunity for [Burns] to assault [Kennedy] that would not have otherwise existed.’ ”) (emphasis added) (alterations and omission in original). The risk that Burns would react violently when he discovered the allegations Kennedy had made against him existed entirely apart from any action attributable to Officer Shields. In fact, the risk to Kennedy would have been even greater if Kennedy was unaware that Burns had learned of the allegations.
In short, I cannot join the majority’s holding that Grubbs I put Officer Shields on notice that by responding to Kennedy’s phone message, informing Angela Burns of Kennedy’s allegations, immediately notifying Kennedy of as much, and offering to increase surveillance in the neighborhood, he was violating her Fourteenth Amendment due process rights — and that the violation was so obvious that Shields should have known it.
No case of which I am aware, either in our circuit or any other, has found a cognizable due process violation on facts re *1081 motely analogous to these.[9] On the contrary, the closest case to this one in our circuit concluded that the plaintiff could not establish a due process violation. As my earlier discussion of Nicholas v. Wallenstein makes clear, its facts are strikingly similar: A state officer released incident reports with the plaintiff prison workers’ identities to the angry family and friends of a deceased prisoner; plaintiffs were immediately harassed and assaulted. 266 F.3d at 1084-86. When the state official “released the incident reports he knew that the crowd to whom he was releasing *1082 them believed that personnel connected with the jail had killed” the deceased prisoner and that the reports “would excite the crowd.” Id. at 1087. Yet, when presented with these facts a few years ago, we held that the “plaintiffs failed to produce evidence that would create a triable issue of material fact showing that the danger was known or obvious to the defendants.” Id. at 1085. What we stated there bears repeating here: “.Knowing that the crowd was angry was not knowing that they would take criminal measures to make the jailors or their health helpers pay.” Id. at 1087.
We have always drawn a sharp distinction between facts demonstrating that police action created the danger to the person and facts demonstrating a danger that existed without police action.[10] See Wood, 879 F.2d at 589-90. In addition, since Grubbs II, we have required plaintiffs to meet a stringent culpability requirement designed to prevent the imposition of § 1983 liability for negligent conduct, even grossly negligent conduct. 92 F.3d at 899-900. And since Huffman, 147 F.3d at 1061, and Lawrence, 340 F.3d at 957, we have emphasized that the requisite culpability must relate to consequences which were foreseeable. The majority’s conclusion in this case does not simply whittle away at these requirements; it completely reinvents them and then declares them “clearly established.”[11]
I cannot envision how it “would be clear to a reasonable officer that his conduct was unlawful” in the situation at issue in this case. Saucier, 533 U.S. at 202, 121 S.Ct. 2151. Assuming, arguendo, that Kennedy’s allegations are sufficient to state a constitutional violation, there is no way Shields could have anticipated that his fifteen-minute delay in notifying Kennedy, combined with his statement that he would patrol the area, was depriving her of her rights under the Due Process Clause of the Fourteenth Amendment. Even if he had read Grubbs I — but especially if he had read Wallenstein — Officer Shields could not 'have known that his conduct would violate “clearly established” constitutional rights. See Meyers v. Redwood City, 400 F.3d 765, 774 (9th Cir.2005) (“Even with a copy of Harris in their back pockets, the officers could not have determined at what point in the middle of this messy repossession they deprived Meyers of her property without due process of law.”). I would hold that, taking into account the “specific context of th[is] case,” the right was not clearly established at the time Officer Shields acted, and Shields is thus entitled to qualified immunity. Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
III. CONCLUSION
Given the tragic circumstances in which this case arises, the Court’s instruction in *1083 DeShaney seems especially apt: “Judges and lawyers, like other humans, are moved by natural sympathy in a case like this” to find a way for Kennedy and her family “to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State,” but by Michael Burns. 489 U.S. at 202-03, 109 S.Ct. 998. The people of Washington may prefer, and are free to adopt, a system of tort liability which would place upon the State and its officials the responsibility for situations such as the present one. “But they should not have it thrust upon them by this [c]ourt’s expansion of the Due Process Clause of the Fourteenth Amendment.” Id. at 203, 109 S.Ct. 998.
I respectfully dissent.

. Although I dissent on the merits, I agree with the majority's conclusion that we have jurisdiction to hear this interlocutory appeal.

. The majority devotes a lengthy footnote to establishing the pre-DeShaney existence and the current prevalence of the state-created danger doctrine. I do not dispute that this doctrine is well established, merely its application to this case. On this note, the cases cited by the majority in its footnote support my view of this doGtrine; see footnote 9, infra.

. The majority cites to Penilla for the proposition that this Court has "specifically rejected the 'danger creation' versus 'danger enhancement' distinction.” Maj. Op. at 1063 n. 4; Penilla, 115 F.3d at 710 ("The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.”). This reading of Penilla is misguided. Reading the larger passage in which this sentence appears produces a different picture:
The officers argue that under DeShaney, a constitutional duty to provide care is only triggered when a person is in custody. We reject this argument....
We have interpreted DeShaney to mean that if affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983. In Grubbs we explained:
DeShaney did not rule that custody was required where the state affirmatively causes the harm.... DeShaney thus suggests that had the state created the danger, [plaintiff] might have recovered even though he was not in custody.
The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.
Id. at 710 (citations omitted). Our opinion in Penilla focused on the new danger that the officers created for Penilla: that by affirmatively calling off the paramedics and moving him from his porch — where neighbors and a passerby had seen his predicament and rendered aid — into his locked house, police isolated Penilla, making it impossible for him to receive medical care.

. There may be some latent dispute regarding whether the "proximate cause” requirement noted in Huffman, 147 F.3d at 1061, and Lawrence, 340 F.3d at 957, is in addition to, or a mere rephrasing of, the requirement that the danger to the plaintiff must have been "known or obvious” and the state actor must have acted with deliberate indifference to the danger. See, e.g., Grubbs II, 92 F.3d at 899-900. Nonetheless, for purposes of the instant case, the relevance of Huffman, Lawrence and Wallenstein derives simply from their recognition that traditional causation principles are not wholly suspended in the context of a constitutional tort suit premised on state-created danger.

. The majority makes some effort to suggest that their theory of this case does not turn on the question of whether officer Shields contacted Kennedy before or after he spoke to Burns. See Maj. Op. at 1063 (“The existence of this danger does not depend ... on a difference of fifteen-minutes .... ”). However, if this is the case, it becomes entirely unclear precisely what Shields's misconduct was, and accordingly even more difficult for Shields to have known that his conduct was not merely wrong, but that it violated Kennedy’s constitutional rights. Moreover, Kennedy only argues that Shields's error was telling her before he told Burns. Thus, the opinion’s vague contrary language notwithstanding, the majority opinion must rest on the fact that Shields informed Burns before telling Kennedy he was going to do so. See Maj. Op at 1063 (“[Shields] did [not] give Kennedy a reasonable opportunity to protect her family.”). I therefore treat it as such.

. In my view, whether or "not Burns would inevitably discover the allegations against him is not, as the majority states, “beside the point”; it is a question of crucial importance for this case. Maj. Op. at 1063 n. 3. If this was a specific danger from Burns that Kennedy had to face, it becomes clear that Shields could not have created it.
Moreover, the majority’s suggestion that Burns might never need to be notified of the allegations against him strains credulity. Id. The majority's quotations from the record only suggest that Burns should have been notified at the end of the investigation. Moreover, these same quotations also establish that this was done so that an officer questioning Burns would be better able to identify whether he was lying, not because it reduced the chance of a violent response.

. The majority opinion incorrectly characterizes my position as "requiring foreseeability of the specific injury Burns in fact inflicted on the Kennedys.” Maj. Op. at 1064 n. 5. I agree with the majority that "the exact injury inflicted by a third party” need not have been foreseeable. Id. However, Kennedy argues here that Shields's misconduct was informing Michael Burns that her daughter had made allegations against him without giving her pri- or warning. By Kennedy’s own testimony, Shields made her aware that Burns had been notified immediately after he had .notified Burns. It certainly was not foreseeable that this difference — telling Kennedy immediately before or immediately after informing Bums — would lead to the type of injuries that she suffered. See also Wallenstein, 266 F.3d at 1087 (finding that it was not foreseeable that the friends and family of a deceased inmate who blamed jail personnel for the death "would take criminal - measures” against said jail personnel); id. ("The most serious incident, assault with a gun, was the sort of opportunistic crime which could not have easily been anticipated nor easily guarded against.”).

. Considering the alternative courses of conduct Shields could have taken to escape liability under the majority's theory only highlights the artificiality of the majority's analysis. Under the majority's theory, Shields could simply have reversed the order in which he visited the residences of the plaintiff and her would-be assailant, or called Kim Kennedy on his cell phone from the Burnses' doorstep. I cannot agree with the majority's position that this flipflop of no more than fifteen minutes is of constitutional magnitude.

. This includes all of the cases to which the majority cites to stress the prevalence of the state-created danger doctrine, see Maj. Op. at 1061 n. 1, none of which give notice here. Some of these cases involve facts such as those in Wood, where the police needlessly left people that were in some way helpless in a dangerous environment; these cases are inapplicable. See Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996) (holding that allegations that police left heavily intoxicated pedestrian alone to walk home on cold night could establish violation); Reed v. Gardner, 986 F.2d 1122 (7th Cir.1993) (denying summary judgment for defendants where police arrested a driver and left an intoxicated passenger in the vehicle with the keys); White v. Rochford, 592 F.2d 381, 384 (7th Cir.1979) (finding that the complaint alleged a violation where police "left helpless minor children subject to inclement weather and great physical danger without any apparent justification”). Others involve police who were aware of a clear and obvious danger and actively chose not to provide their usual level of protection out of a desire to encourage the would-be violent actors. See Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir.1993) (finding a possible violation where complaint alleged "that the officers conspired with ... 'skinheads’ to permit [them] to beat up flag burners with relative impunity, assuring [them] that ... they would not be impeded or arrested,” thereby purposefully ”increas[ing] the likelihood that [they] would assault demonstrators”); Freeman v. Ferguson, 911 F.2d 52 (8th Cir. 1990) (holding that complaint alleging that police chief failed to act to perform his duties because of his close personal relationship with perpetrator was insufficient to establish á violation, but that specific allegations that he actively prevented other officers from doing so could support a claim). With a single exception, all of the cases cited by the defense which have facts that are even arguably close to those presented in this case were decided in favor of the government actors. See Butera v. District of Columbia, 235 F.3d 637, 652 (D.C.Cir.2001) (dismissing suit by estate of slain undercover informant because the informant's “constitutional right to protection by the District of Columbia from third-party violence was not clearly established”); Uhlrig v. Harder, 64 F.3d 567 (10th Cir.1995) (dismissing suit alleging that state created the danger that led to a therapist's death by eliminating mental hospital's special unit for criminally insane); Wells v. Walker, 852 F.2d 368 (8th Cir. 1988) (finding no violation, and, at most, negligence, when police released a convict from custody outside of a store without warning the owner that he was dangerous, and the convict killed the owner); Bowers v. DeVito, 686 F.2d 616, (7th Cir.1982) (finding that no right had been violated when inmate who had repeatedly attacked women with knives was released from commitment and subsequently killed a woman with a knife). The only case finding a violation which is at all similar is Kallstrom v. City of Columbus, 136 F.3d 1055 (6th Cir. 1998), in which the court found that undercover police officers who had worked to convict members of a gang with propensity for violence and intimidation were entitled to an injunction requiring the city to provide them with notice before publicly releasing certain information from their personnel files that the city had assured them would be kept confidential. This information included "the officers’ addresses and phone numbers; the names, addresses, and phone numbers of immediate family members; the names and addresses of personal references; the officers’ banking institutions and corresponding account information, including account balances; their social security numbers; responses to questions regarding their personal life asked during the course of polygraph examinations; and copies of their drivers’ licenses, including pictures and home addresses.” Id. at 1059. Nonetheless, this case is easily distinguishable because while in Kennedy’s case disclosure was inevitable, the gang members in Kallstrom would never have learned this information absent a disclosure by the city. Moreover, the majority does not rely on this case in its opinion.

. The majority relies on a single sentence in Penilla to suggest otherwise; this reading is flawed. See footnote 3, supra.

. The majority claims that I have improperly engaged in "an elaborate fact-matching exercise” to demonstrate that "none of our state-created danger cases clearly enough established the requisite notice,” and that this exercise is “misguided” and "analytically flawed.” Maj. Op. at 1066 n. 7. While I wholeheartedly agree with the majority that an "exact factual predicate” is not required for a right to be clearly established, neither do I believe that we should decide whether a right is clearly established without considering the facts of the other cases in which we have considered that right. I believe the majority's unwarranted extension of the law makes a mockery of prior decisions emphasizing the importance of providing fair warning to government officials. I think this approach is unwise generally, but that it is especially troubling here, where the case with the closest facts is clearly not Grubbs I, but Wallenstein — a case where we ruled in favor of the government official.